UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MAGGI QUILLEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 3:12-cv-1194 |
| v. ) | Judge Aleta A. Trauger |
| ) | |
| TOUCHSTONE MEDICAL IMAGING LLC, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Defendant Touchstone Imaging, LLC ("TMI") has filed a Motion for Summary Judgment (Docket No. 17), to which plaintiff Maggi Quillen filed a Response in opposition (Docket No. 28), and TMI filed a Reply (Docket No. 33). For the reasons stated herein, the motion will be granted in part and denied in part.

## BACKGROUND

### I. Procedural History

On November 16, 2012, Quillen filed a Complaint against TMI, asserting claims for (1) disability discrimination under the American with Disabilities Act ("ADA"); (2) retaliation under the Family and Medical Leave Act ("FMLA"); and (3) violations of the Tennessee Human Rights Act ("THRA") and the Tennessee Disability Act ("TDA"). TMI has moved for summary judgment on all of these claims, arguing that (1) Quillen is not an "eligible employee" under the FMLA and (2) there is no genuine dispute of material fact as to whether Quillen can show pretext

1

on the remaining claims.[1]  Quillen concedes that summary judgment on the FMLA claim is warranted.  However, Quillen argues that there is a genuine dispute of material fact on the issue of pretext as to the remaining claims.[2]

## II.    Factual Background

The court draws the facts from the parties' statements of fact, taking into account the parties' respective objections thereto.  Notably, other than disputing the relevance of certain asserted facts, TMI has only asserted one evidentiary objection to the additional facts relied upon by Quillen.

TMI owns and manages radiologic imaging centers in the United States.  Its headquarters are located in Brentwood, Tennessee, and TMI employs fewer than 50 employees within a 75-mile radius of that office.

Among other necessary administrative functions, TMI must perform "credentialing," which involves filing paperwork with insurance companies and the government ensuring that radiologists within TMI's network are appropriately credentialed.  As of early 2011, an employee named Linda Turpin performed the bulk of TMI's credentialing work, and Wendy Cripe, who otherwise handled contracting work for TMI, handled the balance of credentialing work.  In early 2011, one of TMI's managed care personnel quit and TMI terminated Turpin.  Cripe temporarily

---

[1]In support of its motion, TMI filed (1) a Memorandum of Law (Docket No. 19), (2) a Statement of Undisputed Material Facts (Docket No. 30); and (3) evidentiary materials, including transcripts of the depositions of Quillen, Brian Smith, Jean Shupe, Christian (Pat) Rice, Keith Bukowski, and Wendy Cripe (Docket No. 18).

[2]In support of her Response in opposition to TMI's motion, Quillen filed a Response to TMI's statement of facts (Docket No. 30), a separate Statement of Additional Facts of her own (Docket No. 31), and additional evidentiary materials, including copies of two emails and the resume of Keith Bukowski.  The defendants filed a Response to Quillen's Statement of Additional Facts.  (Docket No. 34.)

assumed all of the credentialing work while TMI sought a new employee to perform credentialing, with the understanding that Cripe would taking maternity leave as of approximately August 2011.

With input from Cripe, TMI chose to advertise a full-time credentialing position that included health benefits.[3] The intention was to have an employee relieve Cripe of the credentialing function, thereby freeing up Cripe to do other functions when she returned from maternity leave in the fall. TMI's health insurance plan was self-insured. Under that plan, TMI paid the first $50,000 of an individual's medical expenses during a plan year, after which Blue Cross covered 100% of the remainder under a "stop-loss" policy.[4]

At the time TMI advertised the position, Quillen was working full time for the Tennessee

---

[3]The parties dispute whether the record shows that TMI initially considered hiring only a part-time employee for the role. Brian Smith, TMI's Chief Financial Officer, claimed that, with Cripe's blessing, TMI initially advertised the position as part-time, but later changed the offer to a full-time role after receiving limited interest from qualified applicants. Jean Shupe, the Executive Assistant to TMI's CEO Christine Rice, corroborated this account. However, Cripe and Rice both testified that TMI only offered the position as full-time. This dispute is immaterial.

[4]The testimony in the record is not entirely clear as to whether the stop loss policy applied in the aggregate or, in the alternative, to individual employees' health insurance expenses. (*Compare* Rice Dep. at 92:23-24 ("You monitor the cost in a gross sense, not in an individual sense.") *with* 94:15-95:11 ("Q: So Ms. Quillen would have had a $50,000 stop loss? A: Yeah, yep. Q: Okay, so Touchstone is paying out of pocket the first $50,000 of Ms. Quillen's claims? A: Yes. Q: And then once Ms. Quillen's claims topped [sic] at 50,000, then the insurance company began paying the claims on whatever plan Ms. Quillen had chosen? A: Yeah, that's right. Q: [] And is that 50,000 per year . . [?] A: Per Year . . . [a]nd I have no clue whether she reached that limit or not.") *and* Shupe Dep. at 29:1-3 ("[T]here is an attachment point to every employee of $50,000, so anything above $50,000, the company would be reimbursed.") Although TMI argues that the testimony must be construed to mean that TMI would pay up to $50,000 across *all* employees before the stop-loss policy was implicated, Rice's testimony reasonably could be construed as indicating that, if *Quillen's* individual claims topped $50,000, then Blue Cross would cover the remainder. At any rate, under either construction, the operative point is that TMI faced additional potential out-of-pocket expenses from Quillen's ongoing medical bills related to her disability.

3

Orthopedic Alliance ("TOA"), where she was receiving health benefits. In August 2010 (while employed at the TOA), Quillen was diagnosed with Crohn's disease, which is an autoimmune disease that impacts an individual's digestive tract. In Quillen's case, the disease causes "flare-ups" that occur approximately once per year and require her to be hospitalized temporarily each time.

At some point before May 19, 2011, Quillen applied for the credentialing position at TMI and participated in an interview (or interviews) with Cripe, Smith, and Human Resoures Manager Connie Gentry, in which Quillen disclosed that she suffered from Crohn's disease. On May 19, 2011, TMI sent Quillen a formal employment offer, which Quillen accepted. Quillen voluntarily resigned her full-time position at the TOA. On June 11, 2011, Quillen began working at TMI under Cripe's supervision.

Approximately one month after Quillen began working at TMI, Cripe took maternity leave. Cripe returned to work near the end of August 2011. Typically, TMI employees receive an initial performance review after 90 days on the job. Cripe testified that, because she had been away for approximately two-thirds of Quillen's first 90 days on the job, Gentry told her to wait an additional 30 days to perform Quillen's initial review. Cripe and Rice testified that there had been some concern that Quillen was showing up late to work and/or talking on her cell phone during work, although the record contains no written documentation of any violations by Quillen in this regard. The intent apparently was for Cripe to supervise Quillen for an additional amount of time and make her own judgment before administering Quillen's review. In October 2011, approximately 120 days after Quillen began working for TMI, Cripe administered Quillen's initial performance review. Cripe gave Quillen positive marks in all categories.

At some point on or before October 27, 2011, Cripe learned that Rice was angry that Cripe had performed Quillen's review just 30 days after returning to work. Cripe emailed Rice to explain that she had gotten Gentry's approval to move forward with the review at that time. Cripe also indicated that she "had no idea that what we would be evaluating was whether or not to keep the position itself as full-time or part-time." Rice sent an email in response, telling Cripe that (1) he, Shupe, and Gentry had agreed to a 90-day extension before Cripe would review Quillen, not to a 30-day extension, (2) she (Cripe) should have consulted with Smith and Jim Sabolik (another individual with knowledge of Quillen's work) before reviewing Quillen, and (3) given the concerns about Quillen's absenteeism and time spent on the phone, TMI had considered that there might not actually be enough work "to justify a third person in the department," presumably referring to Quillen's full-time role. Rice's email also admonished Cripe that her actions had been not in TMI's best interests. Rice testified that he believed that Cripe's review of Quillen's performance was "flat wrong," indicating that his executive assistant, Jean Shupe, had observed Quillen's allegedly deficient behavior. However, at deposition, Shupe disclaimed any knowledge of Quillen's work performance, stating that she had not tracked Quillen's job performance in any respect. (*See* Quillen Dep. at 17:7-18:2.) Aside from his October 27, 2011 email to Cripe, Rice did not discipline Cripe at the time.[5] Furthermore, Rice did not order Cripe or anyone to amend the existing evaluation or to perform a new one.

On or about October 31, 2011 (just four days after the email exchange between Cripe and

---

[5]At deposition, Rice initially testified that he did not see the performance appraisal until "much, much later when somebody showed it to me . . . ." After being shown email communications suggesting that Rice had actually seen the performance appraisal in October 2011, Rice acknowledged that he must have seen the appraisal within 20 days after Cripe issued it.

5

Rice), Quillen requested and took short-term disability leave for a "flare up" due to her Crohn's disease. Quillen originally was scheduled to return on February 2, 2012. TMI cooperated in Quillen's request, and TMI did not discriminate against her in connection with the request and approval of short-term leave. The parties do not dispute that Quillen's request was medically justified.

While Quillen was on disability leave, Cripe handled Quillen's job responsibilities. According to Cripe, she was unable to handle both her existing responsibilities and Quillen's credentialing responsibilities within her regular 40-hour workweek, causing her (Cripe) to devote the bulk of her time to the credentialing work. Based on her experience handling Quillen's responsibilities during that time frame, Cripe testified that there was sufficient work to justify a full-time position for credentialing.

At an unspecified point in late 2011 or in January 2012, Rice and Smith began discussing whether the credentialing position needed to be full-time, ostensibly because Cripe had adequately performed the credentialing work while Quillen was on leave. Smith and/or Rice decided to have Sabolik "shadow" Cripe while she worked, and for Sabolik and Cripe to make a recommendation to Smith, Rice, Gentry, and Shupe about whether the work continued to require a full-time position.

At some point before January 23, 2012, Cripe met with Smith several times to express her opinion concerning the role. Cripe and Smith recall the meetings differently: Cripe testified that she told Smith that the role should remain full-time and explained to Smith that, although she had been able to keep up with credentialing while Quillen was away, that was only because she had ignored her other job responsibilities; by contrast, Smith testified that he and Cripe agreed that

6

the position should be part-time. Similarly, contrary to Cripe's testimony, Rice testified that Cripe (as well as Sabolik) "came back and said, [']There's just not enough work to keep somebody busy here.['] They both said that." According to Rice, Cripe specifically "said that" in an email to him, although TMI did not produce a copy of such an email despite a call for its production. Furthermore, Rice testified that he was "pretty sure" that he had "conversations" with Cripe in which she "admitted that this is not a full-time job."

On January 23, 2012, Sabolik sent an email to Shupe, copying Smith, stating that the credentialing position "could be converted to a part-time position." According to Rice, once he received input from Cripe and Sabolik, he (Rice), Gentry, Smith, and Shupe all agreed to accept Cripe and Sabolik's (purportedly) unanimous recommendation.

On February 6, 2012, Quillen returned to TMI.[6] She discovered that, while she was away, TMI had hired Danielle Rice, one of Rice's daughters, and had placed her at Quillen's old desk. Quillen's workspace was moved to a small cubicle in the back kitchen. Also, upon Quillen's return, Smith and Gentry called her into a meeting, in which they explained that TMI had chosen to reduce her role to a part-time position and that she would no longer be entitled to health insurance benefits. Quillen decided that she would not be able to work part-time because the job would no longer carry benefits. On February 10, 2011, Quillen submitted her resignation.

---

[6] At an unspecified point within two to three weeks of Quillen's original return date of February 2, 2012 (presumably in mid-January 2012), Quillen was hospitalized for complications associated with her Crohn's disease. On January 26, 2012, Gentry called Quillen to request an updated doctor's note by the next day. Gentry informed Quillen that management personnel would be on a retreat and that, absent an updated note, Quillen would not be able to return to work until February 6, when management returned to the office. Although Quillen faxed the note to Gentry, it appears that Gentry left early on January 27 and did not personally receive it before leaving for the retreat. Accordingly, Quillen returned to work on February 6, 2012.

On or about February 6, 2011 (following the meeting with Smith and Gentry), Quillen related to Cripe that the credentialing role had been reduced to a part-time position. TMI's decision was apparently news to Cripe. Cripe initiated a heated discussion with Smith, in which she stated that she did not agree with TMI's decision. Smith told Cripe that he understood her position and that "I feel bad too, but there's nothing I can do because we've got to do what we're told" – presumably referring to an instruction from his boss, Rice. Similarly, Cripe – apparently unaware of Sabolik's January 23, 2012 email – spoke with Sabolik about the issue. Sabolik told her that he also believed that the position required full-time work, that he had informed Smith that he believed the role required full-time work (as Cripe had), and that Smith responded by saying that Rice "needed an email saying that it was only a part-time position."[7] Cripe also expressed to Gentry that she believed that TMI had reduced Quillen's position to a part-time position in an effort to avoid paying future medical expenses due to Quillen's Crohn's disease. (*See* Quillen Dep. at 76:16-24.)

At some point shortly thereafter (in February 2012), Smith and Gentry placed Cripe on probation.[8] According to Cripe, the written disciplinary letter reprimanded her for having conducted Quillen's evaluation prematurely back in October 2011 and for not supporting the company's decisions. Soon after receiving the review, Cripe voluntarily resigned her position at TMI.

A few months later, TMI hired Danielle Rice's roommate (*i.e.*, the roommate of CEO

---

[7]Cripe's testimony on this point appears to contain double hearsay. TMI has not objected to its admissibility on the basis of hearsay for purposes of the instant motion.

[8]It is not clear from the record whether Cripe was placed on probation before or after February 10, 2012, when Quillen resigned.

Rice's daughter), Keith Bukowski, as a full-time employee. Bukowski has handled both the credentialing function and other job responsibilities, including HIPAA compliance and other work. Bukowski apparently has been able to handle all of these responsibilities to TMI's satisfaction.[9]

## SUMMARY JUDGMENT STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2014). At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its burden by showing that there is an absence of evidence to support the non-moving party's case. *Id.* (citing *Celotex*, 477 U.S. at 325). "When the moving party has carried this burden, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).) The non-moving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. *Id.*

---

[9]Although it does not impact the disposition of the instant motion, the court notes that Rice has a daughter with Crohn's disease.

9

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Moldowan*, 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the nonmoving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587). But "[t]he mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient," *Moldowan*, 578 F.3d at 374 (quoting *Anderson*, 477 U.S. at 252), and the non-movant's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249. An issue of fact is "genuine" only if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).

## ANALYSIS

### I.  FMLA

The FMLA does not cover an "employee of an employer who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50." 29 U.S.C. § 2611(2)(B)(ii). Here, the undisputed facts show that TMI employs fewer than 50 employees within 75 miles of the Brentwood location where Quillen worked. Quillen concedes that summary judgment is appropriate on this claim. *See Hummeny v. Genex Corporation*, 390 F.3d 901, 906 (6th Cir. 2004); *Coen v. Sybron Dental Specialties*, 1 F. App'x 386, 388-89 (6th Cir. 2001).

### II.  Discrimination Claims

The parties agree that Quillen's discrimination claims under both federal and Tennessee law are governed by the standard applicable to ADA claims. *See Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 705 (6th Cir. 2000).

A.  **Applicable Discrimination Standard**

Quillen seeks to establish her discrimination claim based on circumstantial evidence. To make out a *prima facie* case of employment discrimination under the ADA using circumstantial evidence, a plaintiff must show that (1) she was disabled; (2) she was otherwise qualified for the position; (3) she suffered an adverse employment decision; (4) the employer knew or had reason to know of her disability; and (5) she was replaced. *Id.* Once this burden is met, "the burden shifts to the [employer] to articulate a non-discriminatory explanation for the employment action, and if the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's explanation is pretextual." *Id.* at 259.[10]

---

[10]The parties have not addressed the causation standard applicable to Quillen's discrimination claims. In *Lewis v. Humboldt Acquisition Corp, Inc.*, 681 F.3d 312, 321 (6th Cir. 2012) (*en banc*), the Sixth Circuit, in an opinion drawing several vigorous dissents, held that the "but for" causation standard governed ADA claims under the *pre-2008* version of the statute, which prohibited discrimination "because of" an individual's disability. *Lewis* did not address the amended ADA provision that now prohibits discrimination "on the basis of" an individual's disability. *See* 42 U.S.C. § 12112(a) (current 2013). Also, in *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013), the Supreme Court reinforced that the proper causation standard turns on the specific language in each federal anti-discrimination statute. The Sixth Circuit has not addressed this issue in a published post-*Lewis* opinion.

In *Bailey v. Real Time Staffing Servs., Inc.*, 543 F. App'x 520, 523 (6th Cir. 2013), the Sixth Circuit applied the *Lewis* "but for" standard to an ADA discrimination claim in an unpublished case, but it did so without analysis. Also, in *Nilles v. Givaudin Flavors Corp.*, 521 F. App'x 364, 368 n.3 (6th Cir. 2013), the Sixth Circuit noted that the amended ADA language "does not affect the reasoning of pre-2008 decisions *with respect to decision-maker knowledge*," but did not address whether the "but for" causation standard applies to post-2008 ADA claims. (emphasis added). Several district courts within this circuit have continued to apply the "but for" standard, albeit without a textual analysis or any acknowledgment of a potential distinction,

11

### B. Prima Facie Case and TMI's Legitimate Non-Discriminatory Reason

For purposes of the instant motion only, TMI concedes that Quillen has presented sufficient facts to establish a *prima facie* case of discrimination based on TMI's reduction of the credentialing position from full-time to part-time in February 2012.[11] TMI contends that it sought to reduce the role to a part-time position because the company's operations did not experience the growth TMI had expected when it hired Quillen. TMI argues that, particularly after Cripe was able to perform Quillen's work while Quillen was on short-term disability leave, it became apparent that the role required only a part-time employee. TMI's position, which draws from

---

perhaps because the parties did not raise the issue. *See, e.g. Molina-Parrales v. Shared Hosp. Servs. Corp.*, – F. Supp. – , 2014 WL 199856, at *13 (M.D. Tenn. Jan. 17, 2014); *Notarnicola v. Johnson Controls, Inc.*, 2014 WL 1304591, at *4 (E.D. Mich. Mar. 28, 2014); *Travers v. Cellco P'ship*, 2013 WL 6048177, at *5 (M.D. Tenn. Nov. 14, 2013). Courts within other circuits that have acknowledged this issue have reached varying conclusions or have declined to decide it. *See, e.g.*, *Johnson v. Benton Cnty. Sch. Dist.*, — F. Supp. 2d — , 2013 WL 765614, at *5 (N.D. Miss. Feb. 25, 2013) (pre-*Nassar*, finding no meaningful distinction between "because of" and "on the basis of" language, applying "but for" standard); *Bennett v. Dallas Ind. Sch. Dist.*, 936 F. Supp. 2d 767, 782 n.12 (N.D. Tex. 2013) (acknowledging issue, declining to decide it, and applying mixed motive approach for purposes of pending motion); *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 n.1 (7th Cir. 2010) (acknowledging issue but declining to address it); *Siring v. Ore. State Bd. of Higher Educ. ex rel. E. Ore. Univ.*, — F. Supp. 2d, 2013 WL 5636718, at *2-*3 (D. Or. Oct. 15, 2013) (applying motivating factor test, based on finding that, in light of *Nassar*, the text and legislative history of 2008 amendments indicate that Congress intended mixed motive analysis to apply to post-2008 ADA discrimination claims).

Here, TMI is not entitled to summary judgment even under the more stringent (for the plaintiff) "but for" standard of causation. Therefore, the court need not address the causation issue *sua sponte* at this stage. Nor, for that matter, is it clear that the plaintiff will dispute that the "but for" standard should apply at trial in light of *Bailey* and the various district court decisions that have continued to apply the "but for" standard to post-2008 ADA claims.

[11]Quillen's counsel purports to characterize Quillen's ADA claim in part as a "failure to accommodate" claim. This contention is perplexing, because the gravamen of Quillen's claim – and the gravamen of questioning by Quillen's counsel at deposition – is that TMI reduced her position to part-time in an effort to avoid paying medical bills attributable to her disability, *not* that TMI should have "accommodated" her disability in some way.

testimony by Rice and Smith, is sufficient to meet its burden to articulate a legitimate, non-discriminatory reason for its actions. The burden therefore shifts to Quillen to establish that this proffered reason is a pretext for unlawful discrimination.

### C. Pretext Inquiry

In an ADA case, "[a] plaintiff may establish pretext by showing (1) that the proffered reason had no basis in fact; (2) that the proffered reason did not actually motivate the actions; or (3) that the proffered reason was insufficient to motivate the actions." *Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 662 (6th Cir. 1999). Quillen cites this standard and asserts several pretext-related arguments, but Quillen does not specify which of the three theories of pretext she is pursuing with respect to each of these arguments.[12] At any rate, several of Quillen's arguments related to pretext are without merit, although one theory of liability is sufficient to establish a genuine dispute of material fact concerning pretext.

First, in one part of her response, Quillen's counsel erroneously purports to characterize the case as involving the denial of a "reasonable accommodation." (Docket No. 28 at p. 22.) But this case does not involve a purported failure by TMI to accommodate Quillen's disability.

---

[12]The court is growing weary of the continued failure by Mr. Allman and his firm to identify clearly the applicable theory (or theories) of pretext advanced in particular discrimination cases, despite repeated admonitions from this court. These deficiencies sow confusion and create unnecessary work for opposing parties and the court. *See, e.g.*, *Weakley v. Nashville Mach. Elevator Co., Inc.*, 2014 WL 199919 at *10 (M.D. Tenn. Jan. 16, 2014) ("Here, Weakley has not specified which of the three theories of liability he is pursuing, although his arguments and/or supporting materials touch on all three lines of argument."); *Jones v. Unipres*, 2013 WL 5782930, at *10 (M.D. Tenn. Oct. 28, 2013) (observing that the plaintiff "has failed to specify which theory or theories of pretext he is advancing, nor is any particular theory of pretext self-evident"); *Nicholson v. City of Clarksville*, 2012 WL 4026051, at *10 (M.D. Tenn. Sept. 12, 2012) ("The plaintiff does not specifically articulate in his opposition brief why the defendant's legitimate nondiscriminatory reasons are pretextual.").

Second, Quillen appears to quibble with TMI about whether TMI originally considered the position to be a part-time position *before* it hired Quillen. This dispute of fact is immaterial to whether, in February 2012, TMI reduced Quillen's role to a part-time position in response to the accruing medical costs from her Crohn's disease.

Third, Quillen argues that TMI's hiring of Bukowski as a full-time employee somehow proves that Quillen's position should have remained part-time. However, the undisputed facts show that Bukowski performed *both* Quillen's role and additional responsibilities, meaning a comparison to Bukowski does not help Quillen's case.[13]

Finally, Quillen argues that TMI was actually motivated by a desire to avoid paying the costs of her medical insurance. Unlike her other arguments, this theory of pretext draws support from the record. Smith and Rice originally asked Cripe and Sabolik to review the position and make a recommendation. Crediting Cripe's testimony, as the court must for purposes of summary judgment, both Cripe and Sabolik reported back that the position should remain full-time, Rice nevertheless demanded that Sabolik write an email stating that the position should be part-time (regardless of their findings), and Smith told both Cripe and Sabolik that he was simply doing Rice's bidding by reducing the position to part-time. Viewed in the light most favorable to Quillen, a reasonable juror could conclude that Rice engineered a written finding that the position should be part-time, not that Rice *followed* the recommendations of Cripe, Sabolik, and Smith. The evidence reasonably could be construed as showing that Rice wanted to create a better record

---

[13]Quillen's counsel also purports to characterize Bukowski as a "cheerleader," apparently based on the fact that Bukowski had a historic involvement in the sport of gymnastics. Counsel's characterization of Bukowski is not only immaterial to the issues presented in this case, it is inaccurate.

to conceal his true motivation: to avoid paying additional medical bills accrued by Quillen.

Furthermore, the timing of TMI's disciplinary action against Cripe supports a finding of pretext. TMI initially did not discipline Cripe for issuing Quillen's review prematurely in October 2011. However, in February 2012, after Cripe complained to Smith and Gentry that TMI had ignored her recommendation about the credentialing role and/or that TMI had done so to avoid paying Quillen's medical bills, TMI disciplined Cripe relative to the October 2011 review of Quillen. Given that TMI waited four months to discipline Cripe and did so only after she had spoken up for Quillen, a jury reasonably could infer that TMI disciplined Cripe for attempting to expose (or at least probe) TMI's true reason for reducing Quillen's position to part-time.

Certainly, attributing a bad motive to Rice and TMI is not the only conclusion that the jury could draw from the evidence. It may be, as Rice contended at deposition, that Quillen's medical bills played no role in TMI's decisionmaking process and that TMI was simply reevaluating the credentialing role in an exercise of its business judgment. However, the record contains contrary testimony, particularly from Cripe, that creates a genuine dispute of material fact as to whether TMI's stated reason for dropping Quillen's position to part-time was pretextual.[14]

## **CONCLUSION**

For the reasons stated herein, TMI's Motion for Summary Judgment will be granted in

---

[14]Perhaps if TMI had kept a more thorough written record of its decisionmaking process, the result might have been different. However, given the limited documentary record before the court, this case essentially comes down to Cripe's word against that of Smith and Rice, which raises questions of credibility that are for a jury to determine.

part and denied in part, Quillen's FMLA claim will dismissed, and Quillen's remaining discrimination claims (under both federal and state law) will proceed to trial.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge